FEDERAL TRADE COMMISSION,
Appellant,

v.

TEXACO, INC., Appellee.

FEDERAL TRADE COMMISSION,
Appellant,

v.

STANDARD OIL COMPANY, Appellee.

FEDERAL TRADE COMMISSION,
Appellant,

v.

The SUPERIOR OIL COMPANY, INC.,
a corporation, Appellee.

FEDERAL TRADE COMMISSION,
Appellant,

v.

EXXON CORPORATION, a
corporation, Appellee.

FEDERAL TRADE COMMISSION,
Appellant,

v.

SHELL OIL COMPANY, a
corporation, Appellee.

FEDERAL TRADE COMMISSION,
Appellant,

v.

STANDARD OIL COMPANY OF CAL-
IFORNIA, a corporation, Appellee.

FEDERAL TRADE COMMISSION,
Appellant,

v.

MOBIL OIL CORPORATION, a
corporation, Appellee.

Nos. 74–1547 to 74–1551 and
74–1553, 74–1554.

United States Court of Appeals,
District of Columbia Circuit.

Argued 18 April 1975.

Decided 8 Aug. 1975.

Robert E. Duncan, Atty., FTC, with whom Gerald Harwood, Asst. Gen. Counsel, William A. Cerillo, Atty., FTC., Howard E. Shapiro and Robert B. Nicholson, Attys., Dept. of Justice, were on the brief for appellant.

William Simon, Washington, D. C., with whom Roger C. Simmons, Washington, D. C., and Robert L. Norris, Houston, Tex., were on the brief for appellee Exxon Corp., in No. 74–1550 also argued for appellees Shell Oil Co., Standard Oil Co. (Indiana) and Texaco Inc.

J. Wallace Adair, Terrence C. Sheehy, Washington, D. C., and Thomas G. Johnson, Houston, Tex., were on the brief for appellee, Shell Oil Co. in No. 74–1551.

John W. Howard, Chicago, Ill., was on the brief for appellee, Standard Oil Co. (Indiana) in No. 74–1548.

Robert F. McGinnis, New York City, was on the brief for appellee, Texaco Inc., in No. 74–1547. W. C. Weitzel, Jr., New York City, entered an appearance for appellee, Texaco, Inc., in No. 74–1547.

Abe Krash, Washington, D. C., with whom Paul A. Porter, Daniel A. Rezneck, Washington, D. C., and Herbert W. Varner, Houston, Tex., were on the brief for appellee, The Superior Oil Co. Inc., in No. 74–1549.

Lee Loevinger, Washington, D. C., with whom Martin Michaelson, Washington, D. C., was on the brief for appellee Standard Oil Co. of California in No. 74–1553.

Harry M. Reasoner, Houston Tex., with whom Michael J. Henke, Washington, D. C., was on the brief for appellee Mobil Oil Corp. in No. 74–1554.

Before MacKINNON and WILKEY, *Circuit Judges* and JAMESON,* *Senior*

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

*United States District Judge* for the District of Montana.

WILKEY, *Circuit Judge*:

This litigation is an outgrowth of a Federal Trade Commission (FTC) investigation into the reporting of natural gas reserves by natural gas producers in Southern Louisiana.[1] Specifically, we have before us seven consolidated appeals by the FTC from orders entered by the District Court granting enforcement in part and denying enforcement in part of subpoenas *duces tecum* issued by the Commission to appellees, seven large natural gas producers, in connection with its investigation. The subpoena issued to each of the appellees and the orders issued by the District Court are reproduced as appendices to this opinion.

## I. *The Facts and the Issues*

The American Gas Association (AGA) is a trade association of producers, distributors, and marketers of natural gas. Through its Committee on Natural Gas Reserves, the AGA has since 1946 been providing the industry, the Government, and the general public with annual estimates of the *proved* natural gas and natural gas liquid reserves of the United States.[2] For the purposes of gathering reserve data, the nation is divided into ten geographical districts. A member of the Committee on Natural Gas Reserves is assigned to each district; the committee member in turn appoints a subcommittee to assist him in gathering reserve data within the district. The FTC's investigation focuses on the activities of the South Louisiana subcommittee.

In May 1969 when the AGA reported its 1968 figures, they indicated a decline in proved reserves nationally, the first such decline ever reported. Before the year was out, this and other information reaching the Federal *Power* Commission prompted a reopening of its just-concluded Southern Louisiana Area Rate Pro-

---

1. Southern Louisiana as used throughout this opinion includes the offshore producing area (seaward from the Louisiana coastline) and that portion of Louisiana defined as the "South Louisiana District." Joint Brief for Appellees Texaco, Inc., Standard Oil Co. (Indiana), Shell Oil Co., and Exxon Corp. [hereinafter Common Counsel Brief], p. 3 n. 4. Southern Louisiana is recognized as the most important gas-producing area in the country. *Southern Louisiana Area Rate Cases,* 428 F.2d 407, 418 (5th Cir.), *cert. denied,* 400 U.S. 950, 91 S.Ct. 243, 27 L.Ed.2d 257 (1970).

2. Throughout this opinion we will use the term "proved reserves." The following is the definition of proved reserves adopted by the AGA in its annual publication, "Reserves of Crude Oil, Natural Gas Liquids, and Natural Gas in the United States and Canada and United States Productive Capacity," Volume 28, June 1974. The first two paragraphs of the following definition appear on page 103 of this publication, the third paragraph is derived from page 99 and the last paragraph is derived from pages 96 and 97:

Proved Reserves are the estimated quantity of natural gas which analysis of geologic and engineering data demonstrate with reasonable certainty to be recoverable in the future from known oil and gas reservoirs under existing economic and operating conditions. Reservoirs are considered proved that have demonstrated the ability to produce by *either actual production or conclusive formation test.*

The area of a reservoir considered proved is *that portion delineated by drilling* and defined by gas-oil, gas-water contacts or limited by the structural deformation or lenticularity of the reservoir. In the absence of fluid contacts, the lowest known structural occurrency of hydrocarbons controls the proved limits of the reservoir. The proved area of a reservoir may also include the *adjoining portions* not delineated by drilling but which can be evaluated as economically productive on the basis of geological and engineering data available at the time the estimate is made. Therefore, the reserves reported should include total proved reserves which may be in either the drilled or the undrilled portions of the field or reservoir.

Natural gas reserves take into account the shrinkage of the reservoir gas volume resulting from the removal of the liquefiable portions of the hydrocarbon gases and the reduction of volume due to the exclusion of non-hydrocarbon gases where they occur in sufficient quantity to render the gas unmarketable.

The proved reserves estimated are to include all gas reserves regardless of size, availability of market, ultimate disposition or use.

ceeding. Those proceedings will be discussed in more detail below. The May 1970 report for 1969 showed even further declines for total United States reserves and total Southern Louisiana reserves.

In late 1970 the Federal *Trade* Commission began an investigation into the reporting of proved natural gas reserves in Southern Louisiana. In June 1971 the investigation took on more formal status when the Trade Commission issued a resolution authorizing the use of compulsory process in furtherance of a nonpublic investigation. In that resolution the nature and scope of the investigation was defined as follows:

> The purpose of the authorized investigation is to develop facts relating to the acts and practices of . . . [certain named corporations] to determine whether said corporations, and other persons and corporations, individually or in concert are engaged in conduct in the reporting of natural gas reserves for Southern Louisiana which violates Section 5 of the Federal Trade Commission Act, or are engaged in conduct or activities relating to the exploration and development, production, or marketing of natural gas, petroleum, and petroleum products, and other

fossil fuels in violation of Section 5 of the Federal Trade Commission Act.[3]

From the beginning of its investigation the AGA had been cooperating with the Trade Commission on a voluntary basis. As a result the Commission was able to obtain the field-by-field estimates of proved reserves made by each Southern Louisiana subcommittee member for the years 1966 through 1970.[4] The Commission had also obtained reserve information from Form 15 reports filed with the Federal Power Commission. These reports are filed by interstate natural gas pipelines and list recoverable, saleable gas reserves committed to, collected by, or held by reporting pipelines.

Approximately one year after beginning its investigation, on 24 November 1971, the Commission's staff issued identical administrative subpoenas *duces tecum* to eleven natural gas producers. All eleven producers moved to quash the subpoenas. The motions to quash or limit were denied by the Commission on 27 June 1972.[5] Following the Commission's denial, the Trade Commission's staff, after negotiations with the gas producers, offered additional safeguards for the confidentiality of information to be supplied. As a result two producers agreed to comply fully with the subpoenas and

---

**3.** Appendix [hereinafter App.] III 497a.

**4.** These statistics were made available to the FTC subject to an agreement restricting access to and disclosure of the data. The agreement provided, *inter alia,* that:

> (2) Representatives of your Bureau [i. e., the Commission's Bureau of Competition] will make use of such reports only in connection with its current investigation into the reporting of natural gas reserves by the American Gas Association, and for the purpose of verification of natural gas reserves estimates reported by the A.G.A. Committee on Natural Gas Reserves; and shall not release, disclose, disseminate or publicize in any manner, to any person, any statistic or data contained in such reports, unless otherwise available in published records or documents, without twenty days prior notice, and opportunity to seek appropriate legal protection or relief, to A.G.A. and to each member of the South Louisiana Subcommittee whose statistics are to be disclosed by the Commission.

Supplemental Reply Brief, pp. 3–4. The agreement also provided that custody of the documents be maintained by a neutral third party, Price Waterhouse & Co.

The producers have alleged in supplemental filings before this court that the FTC breached this agreement by releasing to a Congressman certain staff and working papers containing excerpts from the AGA reserve statistics after less than 72 hours' notice. In a reply the Commission conceded that it had released the information to the Congressman, who by a phone call "required that the documents be immediately released" to him. The Commission argues, however, that the above paragraph was intended to prohibit disclosure of the data to the public or to competitors, and was not meant to cover the case where a Member of Congress or Congressional committee might immediately require use of the data. In addition, the Trade Commission argues that it lacks the statutory power to keep the data confidential to begin with.

**5.** App. III 498a–525a.

one agreed to comply in part. (Soon after petitions for enforcement were filed in the District Court, one more firm agreed to comply with the subpoena.)

Petitions for enforcement of the remaining subpoenas were filed in the District Court on 4 June 1973. On 30 July 1973 the District Court held a hearing on preliminary motions and also heard a preliminary presentation of the issues posed by the case. Subsequently evidentiary materials and briefs were filed by all parties. A second hearing was held on 13 December 1973 at which time the issues were fully argued to the court over a period of several hours.

The two orders here under review were filed on 22 March 1974. One order covered the subpoenas issued to appellees Texaco, Inc., Standard Oil Co. (Indiana), Shell Oil Co., Exxon Corp., Standard Oil Co. of California, and Mobil Oil Corp. The other order related to the subpoena issued to the Superior Oil Co., Inc. (hereinafter Superior). The former order enforced specifications A, B, C, D, E, and F in full; however, it only granted partial enforcement of the remaining specifications, G through L.

The District Court found the subpoenas to be overly broad and unduly burdensome because they sought to duplicate activities of the Federal Power Commission which had already resulted in a finding that AGA proved reserve estimates were valid and accurate. As a result, specifications G through L were modified so that raw field data, bid calculation data, and bid calculation files need not be produced. However, all documents containing or underlying *proved* reserve estimates in the offshore Southern Louisiana area are to be produced.

The court, in an attempt to make the subpoenas less burdensome, limited production of these documents to a random sample of 100 out of approximately 225 relevant fields and to the years 1969, 1970, and 1971. Specifications J, K, and L were similarly modified so that only documents relating to proved natural gas reserve estimates in the offshore Southern Louisiana area need be submitted.

However, the court enforced the subpoena as regards any documents prepared between 1966 and 1971, inclusive, "which were exchanged between or among, or constitute, contain or refer to any agreement, arrangement or communication between or among, respondents or others, including the American Gas Association." The subpoenas were also modified so that additional protections were afforded to confidential information. In addition, producers were accorded the option of producing records for inspection where they were stored.

Superior was in a different position from the other six producers. Superior had never been a member of the AGA nor had it ever furnished proved reserve figures to the AGA. Superior's employees also had not participated in the work of AGA's committees or subcommittees. As a result, the District Court enforced specifications A through F and K through L in full and denied enforcement of specifications G, H, I, and J. Identical confidentiality protections were afforded Superior.

Because the producers have not cross-appealed, the issues before us relate solely to the limiting modifications made by the District Court. For the purposes of this opinion, we have formulated those issues as follows:

(1) Was the District Court in error in refusing to enforce those portions of the subpoenas that called for documents which did not relate to estimates of proved reserves?

(2) Did the District Court abuse its discretion in limiting production of documents to a random sample of fields and to the years 1969, 1970, and 1971?

(3) Did the District Court abuse its discretion in attaching conditions to disclosure to insure confidentiality and in permitting documents to be produced for inspection at their situs?

(4) Was the District Court in error in affording Superior Oil differing treatment?

We proceed now to deal with these issues.[6]

## II. Documents Which Did Not Relate to Proved Reserves

### A. The Arguments

The producers have never quarreled with the power or the right of the Federal *Trade* Commission to investigate the natural gas industry to uncover violations of the antitrust laws or unfair trade practices. However, they argue that there can be no possible reason for wanting documents that do not relate to proved reserve estimates because it is only *proved* reserve estimates that are taken into account by the Federal *Power* Commission in the setting of area rate ceilings. In addition, they argue that the Federal Power Commission, the only agency possessing the requisite expertise, has determined that AGA proved reserve data is accurate. Therefore, the FTC is collaterally estopped from relitigating the issue.

The Trade Commission, on the other hand, points out that there is no provision in the Federal Trade Commission Act (FTCA) excepting gas producers from the coverage of the Act, as there is for banks and certain common carriers, and that therefore jurisdiction to investigate exists. They argue that such jurisdiction is broad, "reaching not only existing violations of . . . [the Sherman and Clayton Acts], but trade practices which conflict with their basic policies." [7] The Trade Commission goes on to argue that, as a factual matter, its investigation does not duplicate studies made by the Federal Power Commission and that, even if it did, collateral estoppel would be inapplicable because its purpose in determining the accuracy of reserve data is different from the Power Commission's purpose in determining accuracy.[8]

6. Standard Oil Co. of California argues that the six producers order is not a final decision within the meaning of 28 U.S.C. § 1291 and therefore is not appealable. We disagree. It is well established that an order of a District Court granting or denying a petition of an agency for enforcement of an administrative subpoena is a final decision and hence appealable. *Ellis* v. *ICC,* 237 U.S. 434, 442, 35 S.Ct. 645, 59 L.Ed. 1036 (1915); *Int'l Brotherhood of Electrical Workers* v. *EEOC,* 398 F.2d 248, 251 (3rd Cir. 1968), *cert denied,* 393 U.S. 1021, 89 S.Ct. 628, 21 L.Ed. 565 (1969); *Martin* v. *Chandis Securities Co.,* 128 F.2d 731, 734 (9th Cir. 1942). The mere fact the District Court indicated that it might be persuaded to reconsider certain aspects of the order if the Commission were able to make an adequate showing *after* examining the documents to be produced does not deny the order of its final character. A final decision is not necessarily "the last order possible to be made in a case. . . ." *Gillespie* v. *United States Steel Corp.,* 379 U.S. 148, 152, 85 S.Ct. 308, 311, 13 L.Ed.2d 199 (1964). A "practical rather than a technical construction" of the District Court's order, *Cohen* v. *Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949), indicates that the Trade Commission should be entitled to appeal an order which shows every sign of being a final resolution of its controversy with the six producers.

7. Appellant's Brief, pp. 17–18.

8. We are fully cognizant of section 15(b) of the Federal Energy Administration Act of 1974, P.L. 93–275, 88 Stat. 96, 109 (7 May 1974), which provides:

> (b) Not later than one year after the effective date of this act, the Administrator shall submit a report to the President and Congress which will provide a complete and independent analysis of actual oil and gas reserves and resources in the United States and its Outer Continental Shelf, as well as of the existing productive capacity and the extent to which such capacity could be increased for crude oil and each major petroleum product each year for the next ten years through full utilization of available technology and capacity. The report shall also contain the Administration's recommendations for improving the utilization and effectiveness of Federal energy data and its manner of collection. The data collection and analysis portion of this report shall be prepared by the Federal Trade Commission for the Administration. Unless specifically prohibited by law, all Federal agencies shall make available estimates, statistics, data and other information in their files which, in the judgment of the Commission or Administration, are necessary for the purposes of this subsection.

The FTC has never argued that this statute provides independent justification for their subpoenas, since, of course, the subpoenas were issued three years before the statute was

Although the producers may be correct in arguing that data relating to any reserves other than *proved* reserves would be irrelevant, our reading of the transcript of the 10 December 1973 hearing indicates to us that the District Court had not reached the issue of relevance in regard to the totality of all documents subpoenaed. The court believed that the Trade Commission had subpoenaed *all* reserve records in order to determine independently the total gas reserves of the area. Since the Power Commission had already determined that AGA figures were accurate, the court was of the view that the Trade Commission could not force the producers to relitigate the matter and that, in any event, it would be unduly *burdensome* to permit yet another plenary investigation (for the third time in two years) of natural gas reserves.

In order to fully understand the District Court's ruling on this aspect of the case, it is necessary for us to discuss the previously alluded to Power Commission investigations.

B. *The Federal Power Commission Investigations*

Although the Federal Power Commission (FPC) began area rate proceedings in 1961 for the Southern Louisiana area, it was not until 1968 that the Commission rendered a final decision, which in turn was modified in early 1969. Even before oral argument could be heard before the Fifth Circuit on petitions for review sought by producers, pipeline companies, and consumers, the FPC had instituted new proceedings (*So La II*)

"to reconsider all major actions it had taken" in the prior proceeding.[9] As the FPC stated in its order instituting *So La II*, Phase I of its new proceeding "should include evidence with respect to the adequacy of gas supply and adequacy of service to consumers, the demand for gas, the gas shortage, if any, the effect of price on gas supply and demand, and other relevant economic evidence . . . ."[10]

The FPC was concerned in *So La II* with complaints that adequate supplies of natural gas were not being produced and would not be produced under the recently ordered area rate ceilings. More important for present purposes, the FPC during *So La II* was presented with the argument by Municipal Distributors Group (MDG), an intervenor which represented the interests of municipal and other publicly owned gas distribution systems, that the supply shortage was more apparent than real. It was argued that "the sharp decline in the supply picture in 1968–69 is revealed by the above record evidence to be caused . . . largely by revisions in the estimates" of proved reserves reported by the American Gas Association (AGA).[11] Such a contention went to the heart of the Power Commission investigation. If it were true that the decline in reserves was a matter of definition and not of economics, the concern of the FPC that new area rates might be required to encourage production would be obviated.

In its final opinion in *So La II* the FPC discussed testimony which was used by MDG to impeach AGA data. The testimony outlined several methods by

enacted. The Commission has, however, used the statute in its briefs as evidence of the fact that "Congress . . . considers the Federal Trade Commission to have a major role in determining the extent of natural gas reserves." Appellant's Brief, p. 22.

In furtherance of its duties under section 15(b), the Trade Commission has prepared yet another questionnaire concerning proved reserves and has sent it to "60 selected natural gas producers." Letter of 28 April 1975 from Commission to the court. The Commission's staff intends to use the responses along with information gathered by the Federal Power

Commission and other government agencies in preparing its natural gas study and in aiding the Federal Energy Administrator in the preparation of its energy report. *Ibid.*

9. *Southern Louisiana Area Rate Cases, supra,* at 421.

10. Order Enlarging Investigation and Proposed Rulemaking Area Rate Proceeding (Southern Louisiana Area), 42 F.P.C. 1110, 1112 (15 December 1969).

11. MDG's Initial Brief in *So La II,* p. 15.

which producers could withhold reserves from the AGA. Discussed also were MDG's arguments relating to discrepancies between figures gathered by the FPC and those submitted by the AGA. The FPC also referred in some detail to the testimony and exhibits supporting the reliability of AGA data. As a result, it reached the following conclusions:

> AGA and Form 15 data show similar trends of reserves and reserve-to-production (R/P) ratios. AGA data indicates a steady decline in the national R/P ratio from 19 in 1963 to 13 in 1969. Form 15 data indicates a similar decline in the national R/P ratio from 20 in 1963 to 14 in 1969. The American Gas Association reserve data is not impeached, in our opinion, in this discrepancy.[12]

> \* \* \* \* \* \*

> For the reasons stated herein, we find the AGA reserve data is reasonably reliable for the purposes used herein. Accordingly, and because petitioner has not raised any new evidence, we deny the petition to reopen.[13]

In other words, while AGA data started with 19 years of reserves and the Form 15 data started with 20 in 1963, by 1969 each calculation had dropped 6 years off its proved reserve figure, so the two calculations were comparable. Thus, AGA data was shown to be reliable.

The issue was raised again on review before the Fifth Circuit and received the following extensive rebuttal in a footnote:

[13] As might be expected, there is some controversy over this. Standing virtually alone against the National (and record) judgment of a near energy calamity, the American Public Gas Association (APGA) contends that the current critical shortage of natural gas is but a pretextual "cry of wolf"

calculated to mislead FPC into establishing artificially high rates in the producers' behalf. APGA would have us believe that the energy crisis is a mirage—indeed, a hoax! APGA claims that "there appear to be adequate supplies of gas in the domestic United States to satisfy the projected demands of U. S. consumers well into the 21st Century." APGA Supp.Brf. at 5 n. 9. But to talk of "Supplies" of gas is a misleading oversimplification. Obviously, the gas is not presently available. At most, if there is appropriate exploration, the demonstrable reserves may be exploited to meet the needs. Given a system which depends on private stewardship and marshalling of natural resources, there is a supply shortage if the producers do not produce. FPC has the statutory duty, not only to guard the consumers against super-profits reaped from artificially inflated rates, but also to protect consumer interests by making sure that the rate schedule is high enough to elicit an adequate supply. It is a delicate balancing test. FPC must fix its course to attain the utopian "optimum" rate schedule. Given the current shortage of available supply FPC must swing the pendulum towards the incentive, supply-eliciting side of rates. And so it has done.[14]

In addition to the examination undertaken in relation to the *So La II* proceedings, the Power Commission undertook in early 1971, at the direction of Congress, a National Gas Survey, a portion of which was a National Gas Reserves Survey (NGRS). NGRS was a completely independent survey of reserves and did not rely on AGA figures at any point. However, in the Final Staff Report of the NGRS (May 1973) a comparison was made with AGA figures:

> The NGRS estimate is lower than the estimate by A.G.A.; however, the

---

**12.** Order and Opinion Determining Just and Reasonable Rates for Natural Gas Produced in the Southern Louisiana Area, 46 F.P.C. 86, 113 (16 July 1971) (footnotes omitted).

**13.** *Id.* at 115.

**14.** *Placid Oil Co.* v. *FPC*, 483 F.2d 880, 894 n. 13 (5th Cir. 1973), aff'd sub nom., *Mobile Oil Corp.* v. *FPC*, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974).

difference is less than 10 percent. The difference of 23.5 Tcf between the estimate of the non-associated and associated gas reserves for the 6,358 entries in the reported fields category (a) is the primary difference between the total estimates. The gas reserves in the "A.G.A. omitted fields" are a relatively insignificant part in the total NGRS estimate, and it seems evident that the 62 entries in the "omitted" category (b) are small fields. The two dissolved gas estimates differ by 1.7 Tcf or by about 5 percent.[15]

## C. Collateral Estoppel

The Supreme Court and this court have clearly stated that an agency or a private party *can* be collaterally estopped in a later court proceeding if a relevant issue had already been resolved in a contested hearing before the agency.[16] The Supreme Court recently affirmed this principle:

Occasionally courts have used language to the effect that *res judicata* principles do not apply to administrative proceedings, but such language is certainly too broad. When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose. *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U.S. 381 [60 S.Ct. 907, 84 L.Ed. 1263]; *Hanover Bank* v. *United States,* 285 F.2d 455, 152 Ct.Cl. 391; *Fairmont Aluminum Co.* v. *Commissioner of Internal Revenue,* [4 Cir.], 222 F.2d 622; *Seatrain Lines, Inc.* v. *Pennsylvania R. Co.,* [3 Cir.], 207 F.2d 255. *See also Goldstein* v. *Doft,* [D.C.N.Y.], 236 F.Supp. 730, *aff'd* [2 Cir.], 353 F.2d 484, *cert. denied,* 383 U.S. 960 [86 S.Ct. 1226, 16 L.Ed.2d 302], where collateral estoppel was applied to prevent relitigation of factual disputes resolved by an arbitrator.[17]

The Supreme Court has also held that collateral estoppel can be applied when the prior proceeding involved a *different* government agency because for collateral estoppel purposes, agencies of the same government are in privity with each other.

Where the issues in separate suits are the same, the fact that the parties are not precisely identical is not necessarily fatal. As stated in *Chicago, Rock Island & Pacific Railway Co.* v. *Schendel,* 270 U.S. 611, 620 [46 S.Ct. 420, 423, 424, 70 L.Ed. 757, 53 A.L.R. 1965], "Identity of parties is not a mere matter of form, but of substance. Parties nominally the same may be, in legal effect, different . . . and parties nominally different may be, in legal effect, the same." A judgment is *res judicata* in a second action upon the same claim between the same parties or those in privity with them. *Cromwell* v. *County of Sac,* 94 U.S. 351 [24 L.Ed. 195]. There is privity between officers of the same government so that a judgment in a suit between a party and a representative of the United States is *res judicata* in relitigation of the same issue between that

---

15. App. VI 1048a.

16. *United States* v. *Utah Construction Co.,* 384 U.S. 394, 421–422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *Sunshine Coal Co.* v. *Adkins,* 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940); *Pacific Seafarers, Inc.* v. *Pacific Far East Line, Inc.,* 131 U.S.App.D.C. 226, 231, 404 F.2d 804, 809 (1968), *cert. denied,* 393 U.S. 1093, 89 S.Ct. 872, 21 L.Ed.2d 784 (1969) ("Principles of collateral estoppel may properly be applied in administrative cases."); *Fairmont Aluminum Co.* v. *Commissioner of Internal Revenue,* 222 F.2d 622, 627 (4th Cir.), *cert. denied,* 350 U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748 (1955); *Tampa Phosphate Railroad Co.* v. *Seaboard Coast Line RR Co.,* 418 F.2d 387, 399 (5th Cir. 1969), *cert. denied,* 397 U.S. 910, 90 S.Ct. 907, 25 L.Ed.2d 90 (1970); *Int'l Wire* v. *Local 38, Int'l Brhd. of Elec. Workers,* 357 F.Supp. 1018 (N.D.Ohio 1972), *aff'd,* 475 F.2d 1078 (6th Cir. 1973), *cert. denied,* 414 U.S. 867, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973).

17. *United States* v. *Utah Construction Co., supra,* at 421–22, 86 S.Ct. at 1560.

party and another officer of the government.[18]

Other Circuits have applied both these principles in appropriate cases. The Eighth Circuit has held that the FTC was collaterally estopped from claiming use of unfair methods of competition where the claim was based on factual issues resolved favorably for defendants in a prior proceeding instituted under the Food and Drug Act.[19] Reciprocally, the Seventh Circuit upheld the defense of collateral estoppel in a proceeding under the Food and Drug Act where a prior proceeding *before* the FTC held that defendant's labeling claims were not deceptive.[20]

■ It is difficult for us to discern why the policies which support the application of *res judicata* or collateral estoppel between court adjudications involving different agencies would not always be equally applicable between administrative adjudications (especially in an era when administrative agencies are taking on duties which were once the preserve of the courts). However, there is no need to resolve this broader issue at this time because we hold that the application of collateral estoppel is clearly appropriate on the facts of this case. The Trade Commission knew of the Power Commission's adjudicatory proceeding in *So La II* when it initiated its own investigation and could have intervened in the proceeding. We also weigh heavily the fact that the Power Commission has particular expertise on the factual issue involved, the accuracy of industry figures on *proved* natural gas reserves. In addition, we find that an area rate proceed-

ing, bringing together as it does sharply divergent economic interests in the same arena to do battle, provided an excellent context in which to resolve such an issue. The record clearly indicates that *So La II* was conducted in an adversarial environment wherein third parties with adverse economic interests participated at all stages of the proceedings.

■ Having concluded that the application of collateral estoppel would be appropriate in this case, we turn now to the essentially factual question whether the Power Commission actually did determine an issue which the Trade Commission now seeks to relitigate. We note that on this matter our scope of review is narrower; we may reverse the District Court's determination only if it is clearly erroneous.[21] The Trade Commission in its briefs never directly argues that the Power Commission did *not* actually determine the accuracy of AGA figures. Rather, the Trade Commission contends that the Power Commission only determined that AGA figures were appropriate for its use in the determination of just and reasonable rates. The Trade Commission seeks to determine whether the producers are underreporting reserves and are thus violating the FTCA. We agree with appellees that the distinction is illusory. "[T]he FTC's very theory is that there is antitrust significance in reporting misleading reserves data *because* rates were affected."[22]

The District Court probed counsel for the Trade Commission on this point several times. At some points counsel argued that it wanted reserve estimates

---

**18.** *Sunshine Anthracite Coal Co.* v. *Adkins, supra,* 310 U.S. at 402–03, 60 S.Ct. at 916. *See also French* v. *Rishell,* 40 Cal.2d 477, 254 P.2d 26 (1953) (*en banc*).

**19.** *George H. Lee Co.* v. *FTC,* 113 F.2d 583 (8th Cir. 1940).

**20.** *United States* v. *Willard Tablet Co.,* 141 F.2d 141 (7th Cir. 1944).

**21.** Rule 81(a)(3), F.R.Civ.P., provides that Federal Rules of Civil Procedure "apply to proceedings to compel the giving of testimony or production of documents in accordance with a

subpoena issued by an officer or agency of the United States . . . ." We are thus bound by Rule 52(a), which states that "[f]indings of fact shall not be set aside unless clearly erroneous . . . ."

Another requirement for the application of collateral estoppel is that "the issue in the prior action must have been necessary and essential to the resulting judgment." 1B *Moore's Federal Practice* ¶ 0.443[1] (1974). The FTC has not argued this issue in this appeal.

**22.** Common Counsel Brief, p. 25 n. 49.

because it was investigating "possible collusive conduct by the natural gas producers in the reporting of these reserves."[23] In this regard, the District Court explicitly stated in its order that the producers must produce all documents passing *inter se* or with the AGA.[24] At other points the argument appears to be what we set out above.

There can be no question that the Trade Commission has jurisdiction to determine whether the antitrust laws or the FTCA has been violated. However, the District Court was entitled to conclude on the present record (1) that the Trade Commission desired all reserve data in the possession of appellees in order to recompute independently Southern Louisiana reserves, and (2) that the Power Commission, on the basis of a contested evidentiary hearing, had found that the industry's figures for Southern Louisiana reserves for the relevant years were accurate. Based on these findings, the District Court could reasonably have concluded that it would be unjust and unreasonable to require the production of every scrap of data which related to reserves *of any kind*. By limiting production to "documents containing or underlying *proved* natural gas reserve estimates," the court has drawn a reasonable balance between the investigatory needs of the Trade Commission and the producers' claims arising out of the prior Power Commission investigations.

### D. *The Bid Files*

Among the documents which would be liable to disclosure under specifications G, H, and I would be the producers' bid files. The bid files include information which producers assemble *in advance* of an oil lease bid. The information is based upon *limited* geophysical information and usually not upon actual explora-

tion. The producers consider the models they have developed for making lease bids the most valuable trade secrets they own, because of the large outlays which have gone into their development and the ease with which any producer could be outbid on leases if its competitors had access to the model.[25] The producers assert that data contained in a bid file would give a competitor easy access to their bid models and understandably strongly argue against disclosure.

The producers argue that the bid files are not relevant to any calculation of *proved* reserves, because the bids files only contain speculative estimates of producing capacity based on limited information. Once a producer obtains a lease and thus is able to drill exploratory wells, these bid estimates are no longer used by the company (except presumably to improve their bidding model or to analyze the bidding behavior of opponents). As a result, producers contend that the bid files could not be relevant to an investigation into conspiratorial and other practices to underreport *proved* reserves.

The Trade Commission on the other hand argues that "[t]he 'bid files' contain estimates of reserves, no matter how speculative or untested, and as such, are plainly relevant to the analysis of gas reserve reporting which is part of the Commission's investigation."[26] The Trade Commission adds in a footnote that the FTCA gives it the authority to report to Congress and that it therefore should be permitted to gather information for that purpose as well as for the more limited purpose of individual cease-and-desist orders.

The Supreme Court in *Oklahoma Press Publishing Co.* v. *Walling*[27] clearly indicated that the District Court must consider in an enforcement proceeding whether the documents sought

**23.** App. II 352a.

**24.** See ¶ 3(b) of the six producers order. Reproduced as Appendix B.

**25.** Mobil Oil Co. refers us in its brief to "the all too frequent cases in which such information has been stolen and sold for large sums of money. *See, e. g., Tlapek* v. *Chevron Oil Co.,* 407 F.2d 1129 (8th Cir. 1969); *Abbott* v. *Unit-*

*ed States,* 239 F.2d 310 (5th Cir. 1956); *Hunter* v. *Shell Oil Co.,* 198 F.2d 485 (5th Cir. 1952); *Ohio Oil Co.* v. *Sharp,* 135 F.2d 303 (10th Cir. 1943)." Brief of Mobil Oil Co., p. 27.

**26.** Appellant's Reply Brief, pp. 9–10.

**27.** 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946).

by an administrative subpoena are relevant to the agency's inquiry. The judicial function in this regard is to be considered "neither minor nor ministerial."[28] Because such a question is essentially factual in nature, we must defer to the District Court's finding unless we can conclude that its determination was clearly erroneous.

■ The evidence and argument presented to the District Court permitted it to conclude that the producers' bid file contained highly speculative estimates, which would be rapidly superseded by much sounder estimates, once the winning bidder could begin drilling. After the first well is drilled on a lease, no company relies on bid file data, nor is such data ever reported to the AGA. Only data relevant to *proved* reserves is reported, and the essential ingredient in the definition of "proved reserves" is that the data is obtained by drilling, by penetration of the formation.[29] The "proved reserves" definition is accepted by the industry, the Power Commission, and the Trade Commission here. Thus, even if the bid file data showed a gross disparity compared to the data on *proved* reserves submitted to the AGA, this would prove nothing except that the company's original bid estimates were sadly in error, for by definition the *proved* reserves data must be based on geological information obtained by drilling at a later time than when the bid data is assembled. The preliminary data has no relevance whatsoever in showing whether the preliminary estimates of reserves should later be moved to the strictly defined category of "proved reserves."[30]

The Trade Commission makes one final argument, that companies sometimes delay drilling in order not to acquire any proved reserve data which they would be obligated to turn in to the AGA. Aside from the dubious wisdom (and likelihood) of a petroleum company paying millions of dollars and then permitting the lease to go untested, the District Court judiciously added the following caveat:

> If you can later come back to me with a situation where a company has been awarded a bid on a property and has delayed an unreasonable time in drilling on it so they could come up with a proper estimate, then you may apply and I will consider giving you the bid file on that particular one.[31]

We therefore affirm the District Court's finding that the bid materials were not relevant[32] at the present time to the Trade Commission's inquiry and the related modification contained in paragraph 2(a) of its six producers' order.

III. *Random Sampling and Time Limitations*

The Trade Commission argues that the District Court should have required complete disclosure of all proved reserve data in the Southern Louisiana area back through 1962. Instead, the court ordered disclosure (1) of proved reserve data for a random sample of 100 fields out of the 220 in Southern Louisiana (2) for the years 1969, 1970, and 1971.

■ It is well established that an enforcing court may limit through modification or partial enforcement subpoenas

**28.** 327 U.S. at 217, n. 57, 66 S.Ct. 494.

**29.** *See* note 2, *supra.*

**30.** There is no consistently used or accepted definition for reserves other than "proved reserves." Various companies describe their data, at different stages, as "probable," "possible," "recoverable," and "ultimately recoverable."

**31.** App. II 431a.

**32.** We noted earlier that the District Court had not reached the issue of relevance with regard to the overall category of documents that do not relate to proved reserves. Page 144. Although logically the bid files fall within this category, throughout these proceedings they have been treated and discussed as if they were a discrete class of documents. The Record indicates that the District Court gave separate consideration to the bid files and ultimately based the relevant portions of the final order on a finding that the bid files lacked relevance. App. 431a.

it finds to be unduly burdensome.[33] Such modification or partial enforcement is an exercise of the District Court's sound discretion and will only be overturned on appeal for abuse of discretion.[34]

With respect to the random sampling, the Trade Commission's position is that

Such a limitation and sampling would make impossible any comparison of the total data supplied by producers who have fully complied with the subpoenas with the limited data which would be forthcoming from producers who supplied documents on only a random and numerically limited basis. Similarly the comparison with all the data submitted to the AGA for this region would be foreclosed.

. . . Clearly the requirement that the Commission resort to a random sample of 100 fields would preclude any possibility of making a reasonable evaluation of natural gas reserves or checking the accuracy of estimates of natural gas reserves for Southern Louisiana.[35]

■ On either theory of its investigation the Trade Commission's argument is unconvincing. If the Trade Commission is looking for an antitrust conspiracy, a random sample made up of data from 45% of the relevant fields should be adequate to turn up evidence of a conspiracy (if there is evidence to be turned up). If the FTC is investigating whether either the industry-wide definition of proved reserves or the manner of reporting such reserves is an unfair trade practice, we fail to see how a random sample of data from 45% of the fields would be

inadequate. A random sample permits comparisons between producers or between producers and the AGA figures, especially since the FTC already has the AGA's complete field-by-field figures.[36] The District Court was entitled to conclude on the record before it that disclosure of data from all 220 fields would be burdensome, and that use of a random sample would neither preclude a reasonable evaluation of the manner in which reserves are estimated nor prohibit the Commission from checking the data as to its accuracy. We therefore affirm this aspect of the District Court's order.

On the other hand, the reasons for limiting disclosure to documents prepared during 1969, 1970, and 1971 are not as apparent to us. The Trade Commission's investigation was triggered, at least in part, by the drop in 1968 and 1969 of proved reserves as reported by the AGA. The Commission would thus appear to need data for a period of time preceding the reported drop in reserves in order to make comparisons. In this regard, we find the Commission's request for disclosure under specifications G, H, and I back through 1962 to be appropriate. We therefore conclude that the District Court's failure to require such disclosure is an abuse of discretion and must therefore be reversed.

## IV. Confidentiality and Production at Situs

■ The District Court attached the following conditions upon the disclosure of documents designated as confidential:

(1) The Secretary of the Federal Trade Commission is designated the custodian of the documents;

**33.** *SEC* v. *Brigadoon Scotch Dist. Co.,* 480 F.2d 1047, 1056 (2nd Cir. 1973), *cert. denied,* 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974); *Adams* v. *FTC,* 296 F.2d 861, 866-67 (8th Cir. 1961), *cert. denied,* 369 U.S. 864, 82 S.Ct. 1029, 8 L.Ed.2d 83 (1962); *Hunt Foods & Industries, Inc.* v. *FTC,* 286 F.2d 803, 811 (9th Cir. 1960), *cert. denied,* 365 U.S. 877, 81 S.Ct. 1027, 6 L.Ed.2d 190 (1961); *Chapman* v. *Maren Elwood College,* 225 F.2d 230 (9th Cir. 1955); *Comet Electronics, Inc.* v. *United States,* 381 F.Supp. 1233, 1242 (W.D.Mo.1974), *affirmed,* —— U.S. ——, 95 S.Ct. 1439, 43 L.Ed.2d 758 (1975); *Genuine Parts Co.* v. *FTC,* 313 F.Supp. 855, 857 (N.D.Ga.1970), *affirmed,* 445 F.2d 1382 (5th Cir. 1971); *In re United Shoe Machinery Corp.,* 6 F.R.D. 347 (D.Mass.1947). *See also See* v. *Seattle,* 387 U.S. 541, 544, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967).

**34.** *NLRB* v. *Northern Trust Co.,* 148 F.2d 24, 29 (7th Cir.), *cert. denied,* 326 U.S. 731, 66 S.Ct. 39, 90 L.Ed. 435 (1945).

**35.** Appellant's Brief, p. 48.

**36.** *See* note 4 and accompanying text.

(2) The documents (and presumably any documents or memoranda derived therefrom) must be kept in a depository with access restricted to the FTC employees assigned to the investigation;

(3) Documents can only be removed from the depository or used for other purposes with the court's permission; and

(4) Upon the termination of the investigation, the documents (and presumably all copies of documents) must be returned to their owner.

The Trade Commission does not question the confidential nature of the documents it seeks disclosed. Rather, its position is that the FTCA and the Commission's Rules of Practice provide appellees with adequate protection. In fact, the FTCA and the Rules of Practice merely state that the public disclosure of geophysical data or information and trade secrets is within the discretion of the Commission. 16 C.F.R. 4.11(d) clearly indicates that the Trade Commission will decide ultimately whether records exempt from disclosure under the Freedom of Information Act (as most of these records probably would be) will be disclosed.

The District Court was not required to rely on the unbounded discretion of the Trade Commission to keep the producers' estimates confidential.[37] In addition, we fail to see how the minor procedures imposed by the court will impose any substantial burden on the Commission's investigation. We therefore hold that the District Court did not abuse its discretion when it attached the conditions listed above to the disclosure of information by all seven appellees.[38]

 The Trade Commission also complains about the option permitting the production of documents for inspection where they are stored. The Supreme Court in *CAB* v. *Hermann* upheld the enforcement of a subpoena "with appropriate provisions for assuring the minimum interference with the conduct of the business of respondents."[39] The Second Circuit has also upheld a similar provision. It noted that "[r]equiring records to be produced away from the place where they are ordinarily kept may impose an unreasonable and unnecessary hardship which in itself would make the issuance of the subpoena, otherwise proper, arbitrary and capricious."[40] Since the number of documents to be produced will be quite large, it is not inappropriate to relieve appellees of some of the expense and burden entailed by permitting them the option of producing documents where they were stored.[41] It would then be the responsibility of the Trade Commission to copy and transport to Washington any documents they consider useful. We affirm the District Court as to the *in situs* condition.

---

37. *See* note 4, *supra*. The action of the Trade Commission, in acceding to the telephoned demand of a Congressman for immediate access to the documents in so short a period of time as to preclude resort to a court, underlines the wisdom and reasonableness of the District Court's protective order on confidentiality. The Federal Rules of Civil Procedure currently provide for motions to quash duly authorized subpoenas, but not phone calls.

38. In order to protect confidential commercial information and trade secrets, District Courts frequently have required appropriate protection as a precondition to enforcement of FTC investigative subpoenas. *See, e. g., FTC* v. *St. Regis Paper Co.*, 304 F.2d 731, 732 n. 1 (7th Cir. 1962); *Graber Mfg. Co.* v. *Dixon*, 223 F.Supp. 1020 (D.D.C.1963); *FTC* v. *Bowman*, 149 F.Supp. 624 (N.D.Ill.), *aff'd*, 248 F.2d 456 (7th Cir. 1957); *FTC* v. *Menzies*, 145 F.Supp. 164, 171 (D.Md.1956), *aff'd*, 242 F.2d 81, 84 (4th Cir.), *cert. denied*, 353 U.S. 957, 77 S.Ct. 863, 1 L.Ed.2d 908 (1957).

39. 353 U.S. 322, 323, 77 S.Ct. 804, 805, 1 L.Ed.2d 852 (1957).

40. *Walling* v. *American Rolbal Corp.*, 135 F.2d 1003 (2nd Cir. 1943).

41. The Trade Commission's arguments notwithstanding, it is common for a District Court to require the administrative agency to inspect subpoenaed records or documents at the place where they are stored. *NLRB* v. *Friedman*, 352 F.2d 545 (3rd Cir. 1965); *Hunt Foods & Industries, Inc.* v. *FTC, supra*, 286 F.2d at 812. *FTC* v. *Bowman, supra*, 149 F.Supp. at 630; *FTC* v. *Menzies, supra*, 145 F.Supp. at 171.

## V. *The Superior Order*

 The Commission concedes that Superior does not report reserve estimates to, or participate in, the work of the AGA. Since the FTC issued identical subpoenas to all producers, it was obvious to the District Court that several specifications, those relating to reporting and participating in the AGA, were not relevant to Superior. As a result, the District Court simply refused to enforce specifications G through J. In all other respects Superior will be required to provide the Commission with the same documents and information that is being required of the other six producers, subject to the confidentiality protections previously discussed. We affirm this order.

## VI. *Conclusion*

 In the last analysis a petition for enforcement of an administrative subpoena *duces tecum* must be judged by the District Court on a case-by-case basis. Because questions of relevance and burdensomeness are peculiarly within the ken of the trial court, appellate tribunals should be wary of second-guessing. In our view, the District Court's orders represent a just and fair accommodation between the Trade Commission and the producers.

To summarize, we have affirmed the District Court's order in all respects save one, the time limitation in paragraph 2 of the six producers' order.

*Affirmed in part and reversed in part.*
See Appendix on next page.

APPENDIX A
SUBPOENA DUCES TECUM

# UNITED STATES OF AMERICA
## FEDERAL TRADE COMMISSION

To_____ Mr. A. C. Long, Chairman Executive Committee & Chief
Executive Officer,

Texaco, Inc.,
135 East 42nd Street, New York. New York. 10017

*You are hereby required to appear before*___Donald K. Tenney, an___

___Attorney and Examiner of___

*the Federal Trade Commission, at*___Room 368, Federal Trade Commission

___Building, 6th and Pennsylvania Avenue, N.W.,___

*in the City of*___Washington, D.C. 20580___

*on the*___5th___ *day of*___January___., 19 72, *at*___10:00___ a.*m.*,

*to testify*___in connection with the Commission's investigation of

___various corporations and persons, File No. 711 0042,___

___pursuant to Commission Resolution dated June 3, 1971,___

___a copy of which is attached and made a part hereof, for___

___the purposes stated therein.___

*And you are hereby required to bring with you and produce at said time
and place the following books, papers, and documents:*_____

___See attached "Definitions" and "Specifications."___

*Fail not at your peril*

*In testimony whereof, the undersigned, an author-
ized official of the Federal Trade Commission, has
hereunto set his hand and caused the seal of said*
\*S E A L\* *Federal Trade Commission to be affixed at Wash-
ington, D. C., this* 24th *day of* November, 19 71

/s/ _____
Assistant Director, Bureau of Competition.

## DEFINITIONS

As used herein, the term "documents" means all writings of every kind including books, records, folios, minutes, reports, memoranda, correspondence, agreements, discounted cash flow studies, cover sheets, calculation sheets, print outs, telegrams, diary entries, pamphlets, notes, charts, and tabulations in the possession, custody or control of the Company. The term "documents" also includes voice recordings and reproductions or film impressions of any of the aforementioned writings as well as copies of documents which are not identical duplicates of the originals and copies of documents of which the originals are not in the possession, custody or control of the Company. The term "documents" further includes all punch cards or other cards, tapes or recordings used in data processing, together with the programming instructions and other written material necessary to understand or use such punch cards, tapes or other recordings.

In response to specifications in which the term "documents" is followed by an asterisk (*), a verified written statement by an officer of the company containing the requested information may be submitted in lieu of the documents called for provided that the underlying documents or source materials are listed or otherwise specifically identified in, or as part of, such verified statement.

Each document submitted must be identified as to the specification or specifications to which it is responsive.

The term "the Company" means the corporation upon which this Subpoena was served as well as its directors, officers, employees, and agents; its subsidiaries and affiliates; and the directors, officers, employees and agents of its subsidiaries and affiliates. The term "the corporation" means the corporation upon which this Subpoena was served.

Unless otherwise stated, the following definitions apply to the specifications that ensue:

1. *South Louisiana.* That geographical area delineated by Map III, page 84, of the May, 1971 edition of *Reserves of Crude Oil, Natural Gas Liquids, and Natural Gas in the United States and Canada and United States Productive Capacity as of December 31, 1970* including the offshore area. The term "Offshore South Louisiana" is defined as that geographic area which lies seaward from the Louisiana coastline. The South Louisiana Offshore Area is sometimes referred to as Federal Areas 1 through 4 and includes the West Cameron Area, East Cameron Area, Vermilion Area, South Marsh Island Area, Eugene Island Area, Shoal Area, South Pelto Area, Bay Marchand Area, South Timbalier Area, Grand Isle Area, West Delta Area, South Pass Area, Main Pass Area, Breton Sound Area, Chandeleur Area and Chandeleur Sound Area and any additions thereto, as indicated on the United States Geological Survey "Oil and Gas Development Map of the Gulf Coast State of Louisiana Outer Continental Shelf", as revised on January 5, 1971.

2. *Net Production.* The definition appearing in *Technical Report No. 1*, Standard Definitions for Petroleum Statistics (First Edition, July 1, 1969), at page 11, is adopted.

3. *Natural Gas Present or Recoverable or Ultimately Recoverable.*

 a. *Present.* Natural Gas in place, i. e., existing either in the gaseous phase or in solution with crude oil in a natural underground reservoir or reservoirs.

 b. *Recoverable.* Natural gas in place that is producible.

 c. *Ultimately recoverable.* Natural gas in place that is producible, together with its cumulative production.

4. *Field.* A field is an area consisting of a single reservoir or multiple reservoirs all grouped on, or related to, the same individual geological features and/or stratigraphical condition. A reservoir is a porous and permeable underground formation containing an individual and separate natural accumulation of hydrocarbons (oil and/or gas) which is confined by impermeable rock or water barriers and is characterized by a single natural pressure system.

5. *Completion Date.* The first date on which any permanent equipment for the production of oil or gas is installed in a well. Completion reports may relate to the abandonment of a well or to the installation of permanent productive equipment.

6 & 7. *Associated Gas; Dissolved Gas.* The definitions of these two terms that appear in *Technical Report No. 1*, Standard Definitions for Petroleum Statistics (First Edition, July 1, 1969), page 6, are adopted.

8. *Nonassociated Gas.* Natural gas which is in a reservoir or reservoirs not containing significant quantities of crude oil.

9–13. *Proved Reserves; Revisions; Extensions; New Field Discoveries;* and *New Reservoir Discoveries in Old Fields.* The definitions of these five terms that appear in *Reserves of Crude Oil, Natural Gas Liquids, and Natural Gas in the United States and Canada and United States Productive Capacity as of December 31, 1970* at pages 102–104, are adopted.

14. *Dedicated Reserves.* The volume of natural gas committed to a pipeline company and for which both the seller and the pipeline company have received certificate authorization from the Federal Power Commission.

## SPECIFICATIONS

A. Documents * which will indicate the correct legal name and business address of the corporation, its date and state of incorporation, and the name, position and home address of each officer and director of said corporation.

B. Documents * which will indicate the correct legal name and business address of the parent of the corporation, the date and state of incorporation of the parent and the percentage ownership the parent has in the corporation, and the name, position and home address of each officer and director of the parent.

C. The corporation's Annual Reports for each of the years 1966, 1967, 1968, 1969 and 1970.

D. Documents * which will indicate the name and address of each subsidiary, affiliate, and division of the corporation and of the divisions of each such subsidiary and affiliate engaged in the exploration, development, production, or distribution of natural gas; the function(s) as heretofore set forth of each; and the dates and states of incorporation and the names, positions, and addresses of officers, directors, managers of each subsidiary, affiliate, and division.

E. Documents * which will indicate (1) each type of customer purchasing natural gas, produced in South Louisiana, from the corporation, its subsidiaries and affiliates and (2) the manner and methods of distribution of such natural gas to each such type of customer.

F. Documents * which will indicate the following for each of the years 1966 through 1970:

1. Total net production of natural gas, in units, in (a) the United States and (b) South Louisiana, by the corporation, its subsidiaries and affiliates.

2. Total unit and dollar volume of sales of the total net production of natural gas produced in (a) the United States and (b) South Louisiana, by the corporation, its subsidiaries and affiliates.

3. Total dollar volume of sales of the total net production of natural gas produced in South Louisiana by the corporation, its subsidiaries and affiliates to each type of customer identified in Specification E(1)—for 1969 and 1970 only.

G. Documents either received (from whatever source) or written by the Company, in whole or in part, at any time between January 1, 1962 to December 31, 1970, which contain estimates or evaluations of the volume of natural gas present or recoverable or ultimately recoverable (1) throughout all of South Louisiana (2) throughout all of Offshore South Louisiana and/or (3) in specific fields, portions of fields, leaseholds and/or portions of leaseholds located in Offshore South Louisiana.

Excluded from this specification are any documents previously made available to the Commission by the American Gas Association and presently in the custody of Price, Waterhouse & Company, 1801 K Street, Washington, D.C. Included in this specification by way of illustration but not limitation are documents containing estimates or evaluations including re-estimates or reevaluations made in connection with or in preparation for or as the result of the following: (1) bidding on or nominating leases (2) deciding whether to erect permanent platforms (3) compiling or inventorying total company reserves or supply (4) negotiating or contracting for the sale of natural gas, or for the joint or common exploration, development, production, purchase or sale of acreage, or for obtaining bank loans (5) filing depreciation expense schedules with Internal Revenue Service or (6) submitting field-by-field estimates to subcommittees or committees of the American Gas Association or the American Petroleum Institute.

H. Documents * indicating any or all of the following with regard to each field and leasehold in Offshore South Louisiana for which estimates or evaluations of the volume of natural gas, pertaining to the whole or a portion thereof, are produced pursuant to Specification G:

1. For each such field and portion thereof, its name and the number(s) of each block number comprising said field or portion thereof—if the field or field portion is situated at least in part in a portion of a block, the portion of the block as well, e. g., "NW ¼";

2. For each such leasehold and portion thereof, the OCS number and the name(s) and location(s) of the field(s) and portion(s) thereof comprising such leasehold or portion thereof;

3. The pipeline company(ies) serving each such field, leasehold, or portion thereof;

4. The producer(s) and the operator(s) of each such field, leasehold, or portion thereof, indicating the precise interest each such producer and operator has in the acreage;

5. For each such field, leasehold and portion thereof, the location (on a map) and designation of each well drilled including (for each such well):

a. The current status as classified by the Company, e. g., "dry and abandoned", "temporarily abandoned", "suspended", "shut-in", "service", "producer", etc.;

b. Whether classified by the Company as an oil or gas well at the time of (1) application for drilling (2) the filing of each completion report (3) currently;

c. The number of reservoirs containing natural gas that have been penetrated by the well;

d. The date drilling commenced; the date total depth was reached; first date of testing; first date of testing officially reported; completion date; date commenced producing.

I. Documents either received (from whatever source) or written by the Company, in whole or in part, at any time subsequent to January 1, 1962, which refer, analyze, compare, comment on, set forth, and/or relate to any or all of the following:

1. Any natural gas estimates or evaluations called for by Specification G; the preparation or completion of such estimates or evaluations; the procedures, criteria or interpretations used in such preparation or completion; the identity of organizational units and personnel of the Company involved in such preparation or completion;

2. Any natural gas estimates or evaluations made available to the Commission by the American Gas Association and presently at Price, Waterhouse & Co., or appearing in any American Gas Association Report on Natural Reserves, published subsequent to January 1, 1967, including the constituent categories of these estimates such as "proved reserves", "revisions", "extensions", "new field discoveries", "new reservoir discoveries in old fields"; the preparation or completion of such estimates or evaluations; the pro-

cedures, criteria or interpretations used in such preparation or completion; the organizational units and personnel of the Company involved in such preparation or completion;

3. Any lease nominations and bids, any agreements for joint or common leasing, exploration, development, production, purchase or sale, or any cash flow or economic feasibility studies preparatory to leasing, exploring, developing, purchasing or selling, which involve Offshore South Louisiana acreage;

4. Any compilation, report or study of "dedicated reserves";

5. Whether any well designated in response to Specification H–5 contains natural gas in sufficient quantities as to be capable of producing in paying quantities.

J. Documents either reecived (from whatever source) or written by the Company, in whole or in part, at any time subsequent to January 1, 1966, which refer, analyze, compare, comment on, set forth, and/or relate to any or all of the following:

1. Any failures or delays, for whatever reason, in reporting proved reserves of natural gas to the American Gas Association, including any failures or delays by personnel of the Association to identify to subcommittee members all fields containing proved reserves;

2. The classification or exclusion or inclusion of volumes of natural gas as proved reserves;

3. The relationship between increases or decreases of crude oil proved reserves with increases or decreases of associated, dissolved or associated-dissolved natural gas proved reserves;

4. Negative revisions to American Gas Association proved reserve estimates because of clerical or mathematical error.

K. Documents either received (from whatever source) or written by the Company, in whole or in part, at any time subsequent to January 1, 1962, which refer, analyze, compare, comment on, set forth, and/or relate to any or all of the following:

1. The relation between the amount of "proved reserves" and the rate allowed, to be allowed, or that may be allowed for natural gas by the Federal Power Commission;

2. The reporting of lower "proved reserve" figures.

L. Documents * naming all employees of the corporation, its subsidiaries and affiliates who have, any time since January 1, 1966 with regard to Offshore South Louisiana, estimated, evaluated or enumerated natural gas proved reserves, dissolved gas proved reserves, potential gas supply or well drilling activity either for the American Gas Association, American Petroleum Institute, Potential Gas Committee, American Association of Petroleum Geologists or the International Oil Scouts, including local scout checks, indicating for each person named (1) the association for which he estimated or enumerated (2) whether a member of the association (3) what was estimated or enumerated and (4) the dates for which he estimated or enumerated for the particular association.

APPENDIX B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Federal Trade Commission<br>v.<br>Texaco, Inc. | Civil Action No. 1089–73 |
| Federal Trade Commission<br>v.<br>Standard Oil Co. (Indiana) | Civil Action No. 1090–73 |
| Federal Trade Commission<br>v.<br>Exxon Corporation | Civil Action No. 1092–73 |
| Federal Trade Commission<br>v.<br>Shell Oil Company | Civil Action No. 1093–73 |
| Federal Trade Commission<br>v.<br>Standard Oil Co. of<br>California | Civil Action No. 1095–73 |
| Federal Trade Commission<br>v.<br>Mobile Oil Corporation | Civil Action No. 1096–73 |

### ORDER

The Federal Trade Commission ("Trade Commission") having petitioned on June 13, 1973, for enforcement of subpoenas *duces tecum* issued by an Assistant Director of the Trade Commission's Bureau of Competition to each of the above captioned respondents on November 24, 1971, in the course of a Trade Commission investigation into natural gas reserve reporting procedures (FTC Investigation File No. 711 0042); and the respondents having opposed enforcement of said subpoenas, contending that the principles of primary jurisdiction and collateral estoppel preclude the Trade Commission from seeking the demanded documents or data for purposes of determining the validity or accuracy of natural gas reserve estimates, and contending further, *inter alia,* that certain demands of the subpoenas are irrelevant to any proper subject or area of investigation and are unduly broad and burdensome; and the parties having fully briefed and presented oral argument on the issues; and the Court upon consideration of all the premises, being of the opinion that the Trade Commission is authorized to pursue the investigation to determine whether there exists any evidence of conspiracy in the reporting of proved natural gas reserve estimates to the American Gas Association by respondents, but that the subpoenas *duces tecum* are improper insofar as they seek data for the purposes of enabling the Trade Commission to attempt to deter-

mine natural gas reserves or the validity or accuracy of natural gas reserve estimates, matters already considered and ruled upon by the Federal Power Commission, and the Court being of the further opinion that the subpoenas are improper in other respects as well and should not be enforced as issued:

It is now therefore ordered:

1. Enforcement of specifications A, B, C, D, E, and F of the subpoenas *duces tecum* is hereby granted. Enforcement of specifications G, H, I, J, K, and L is hereby denied except as provided below.

2. Respondents shall produce documents as called for by specifications G, H, and I of the subpoenas *duces tecum* for the years 1969, 1970 and 1971, subject to the following modifications and limitations:

(a) Production shall be limited to documents containing or underlying proved natural gas reserve estimates. Raw field data, bid calculation data, and bid calculation files are not required to be produced. As regards underlying back-up data for each estimate called for by specification G, only the immediate data used to make the estimate need be submitted. For estimates arrived at volumetrically, specification I(1) will be satisfied by supplying all the underlying numbers which were used in the formula including the recovery factor and the size of the reservoir(s). As for the estimates arrived at by pressure decline curves, specification I(1) will be satisfied by submitting the curve used.

(b) Production of documents shall be made with respect only to a random sample of 100 of those offshore Southern Louisiana fields which were included in reports for 1971 by the Southern Louisiana Subcommittee of the American Gas Association Committee of Natural Gas Reserves. This random sample shall be selected by a procedure agreed upon between Trade Commission and respondents.

(c) Each respondent shall make production with respect to the fields, selected in the manner described in paragraph 2(b), in which it had an ownership interest as of the date reports were submitted by the Southern Louisiana Subcommittee of the American Gas Association Committee of Natural Gas Reserves.

(d) All production ordered pursuant to this paragraph 2 shall be made for the sole purpose of permitting the Trade Commission to investigate whether there is a conspiracy in the reporting of natural gas proved reserve estimates, and not for the purpose of permitting the Trade Commission to investigate or determine the amount of proved natural gas reserves.

3. Respondents shall produce documents as called for by specifications J and K of the subpoenas *duces tecum*, subject to the following modifications and limitations:

(a) Production shall be limited to documents relating to proved natural gas reserve estimates in those offshore Southern Louisiana fields which were included in reports for 1971 by the Southern Louisiana Subcommittee of the American Gas Association Committee of Natural Gas Reserves.

(b) Production shall be limited to documents prepared or dated during the years 1966 through 1971, inclusive, which were exchanged between or among, or constitute, contain or refer to any agreement, arrangement or communication between or among, respondent or others, including the American Gas Association.

4. Respondents shall produce documents as called for by specification L, except production shall be limited to the employees who have acted with respect to proved natural gas reserve estimates for offshore Southern Louisiana during the year 1966 through 1971, inclusive.

5. In complying with this Order, the definition of terms contained in the original subpoenas *duces tecum* shall apply.

6. Respondents shall comply with this Order within 180 days after the date upon which they are advised of the sample fields selected in accordance with paragraph 2(b) hereof.

7. Each respondent shall have the option of producing documents called for by this Order at the corporate office or field location where the responsive documents are normally maintained or at the Federal Trade Commission's offices in Washington, D. C. With respect to documents as to which any respondent elects to make production at a corporate office or field location, the Trade Commission shall inspect and reproduce any of said documents at such office or field location at, such other location as agreed upon by the respective parties, and shall bear any costs of reproduction or copying which the Trade Commission may require or desire.

8. Any document produced under this Order which contains confidential information may be designated as being confidential by the respective respondents, in which event all documents so designated shall be subject to the following protective treatment:

(a) Documents designated as confidential by a respondent shall be deposited with and be maintained by a custodian who shall be the Secretary to the Commission. Unless and until otherwise ordered by the Court upon due notice to all affected parties documents so designated may be inspected only at the depository location and only by employees of the Trade Commission officially assigned to the Trade Commission's investigation entitled "File No. 711 0042." Said documents shall be used only in connection with said investigation, and said employees shall not suffer or permit disclosure or copying of any such document, or any portion thereof, or any information contained therein to any other person.

(b) Unless and until otherwise ordered by the Court upon due notice to all affected parties, documents designated confidential under this Order shall remain in custody of the Custodian and neither the documents nor any copies thereof shall be removed from such custody.

(c) At the conclusion of the Trade Commission's investigation pursuant to which such confidential documents have been produced, all documents so designated as confidential, together with all copies

thereof, shall be returned to the respective respondent unless the Trade Commission seeks and obtains an order of the Court providing otherwise.

(d) The protective provisions of this Order shall be deemed to apply to the Trade Commission, to the individual Commissioners of the Trade Commission and to all persons in the employ of the Trade Commission; sanctions for violation of any provision of this Order may be imposed on the Trade Commission, or any person who violates any provision of this Order.

9. The Court reserves its ruling as to any and all matters, contentions or issues not specifically disposed of by this Order. Jurisdiction over these proceedings is retained for the purposes of providing other and further relief as necessary.

So ordered this 22nd day of March, 1974.

(s) George L. Hart, Jr.

Chief Judge

## APPENDIX C

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Upon consideration of the Federal Trade Commission's petition for enforcement of a subpoena *duces tecum*, the matter having been fully briefed and argued before the Court, and the Court being advised in the premises, it is this 22nd day of March, 1974,

ORDERED, That the respondent, The Superior Oil Co., Inc., shall comply, within 180 days from the date on which this Order becomes final, with Specifications A through F and K through L of the subpoena, provided that Specifications A, B, D, E and F may be complied with by submitting a verified written statement by an officer of the Company containing the requested information in lieu of the documents specified, and it is

FURTHER ORDERED, That as to the respondent, The Superior Oil Co., Inc., Specifications G through J of the subpoena be, and the same hereby are, denied enforcement and quashed; and it is

FURTHER ORDERED, That any document produced under this Order which contains confidential information may be designated as being confidential by the respondent, in which event all documents so designated shall be subject to the following protective treatment:

(a) Documents designated as confidential by a respondent shall be deposited with and be maintained by a custodian who shall be the Secretary to the Commission. Unless and until otherwise ordered by the Court upon due notice to all affected parties documents so designated may be inspected only at the depository location and only by employees of the Trade Commission officially assigned to the Trade Commission's investigation entitled "File No. 711 0042." Said documents shall be used only in connection with said investigation, and said employees shall not suffer or permit disclosure or copying of any such document, or any portion thereof, or any information contained therein to any other person.

(b) Unless and until otherwise ordered by the Court upon due notice to all affected parties, documents designated confidential under this Order shall remain in custody of the Custodian and neither the documents nor any copies thereof shall be removed from such custody.

(c) At the conclusion of the Trade Commission's investigation pursuant to which such confidential documents have been produced, all documents so designated as confidential, together with all copies thereof, shall be returned to the respondent unless the Trade Commission seeks and obtains an order of the Court providing otherwise.

(d) The protective provisions of this Order shall be deemed to apply to the Trade Commission, to the individual Commissioners of the Trade Commission and to all persons in the employ of the Trade Commission; sanctions for violation of any provision of this Order may be imposed on the Trade Commission, or any person who violates any provision of this Order.

The Court reserves its ruling as to any and all matters, contentions or issues not specifically disposed of by this Order. Jurisdiction over these proceedings is retained for the purposes of providing other and further relief as necessary.

SO ORDERED THIS 22 DAY OF MARCH, 1974.

GEORGE L. HART, JR.
George L. Hart, Jr.
Chief Judge