UNITED STATES of America,
et al., Petitioners,

v.

LEGAL SERVICES FOR NEW YORK
CITY, et al., Respondents.

No. Misc.A. 00–0241(JR).

United States District Court,
District of Columbia.

June 14, 2000.

Arthur R. Goldberg, William Alvarado Rivera, David Mendel, U.S. Department of Justice, Civil Division, Washington, DC, for petitioners.

Colby A. Smith, Debevoise & Plimpton, Washington, DC, Carl Riehl, John S. Kiernan, Debevoise & Plimpton, New York City, for respondent Legal Services of New York City.

John F. Cooney, Venable, Baetjer, Howard & Civiletti, LLP, Washington, DC, Mitchell Y. Mirviss, Venable, Baetjer and Howard, LLP, Baltimore, MD, Wilhelm H. Joseph, Jr., Executive Director, Legal Aid Bureau, Inc., Baltimore, MD, for respondent Legal Aid Bureau, Inc.

### MEMORANDUM AND ORDER

ROBERTSON, District Judge.

Before the Court is the petition of the United States and the Office of the Inspector General of the Legal Services Corporation (LSC OIG) for summary enforcement of two administrative subpoenas issued pursuant to section 6(a)(4) of the Inspector General Act of 1978, 5 U.S.C. app. 3 § 1 *et seq.* (1994). Respondents Legal Services of New York City (LSNY) and Legal Aid Bureau, Inc. (LAB) resist the subpoenas, arguing that, on the particular facts presented, it is unlawful for LSC OIG to demand the production of the names of their clients, and would be unlawful for them to reveal such information. Because only privileged materials may be withheld from a response to the subpoenas; because the attorney-client privilege is not properly invoked by respondents' blanket objection; and because the LSC OIG's proposal to erect an administrative "screen" to safeguard the names is not unreasonable, I have concluded that the subpoenas must be enforced.

### Facts

LSC is a non-profit, tax-exempt corporation established by the Legal Services Corporation Act of 1974, 42 U.S.C. § 2996 *et seq.* (1994) (LSC Act). It makes annual grants to more than 200 legal services and legal aid organizations throughout the United States. In 1999, Congress appropriated $300 million for legal services, of which LSNY was granted $11,314,289, and LAB, $3,208,162.

The Inspector General Act charges inspectors general within federal departments and agencies to conduct, supervise and coordinate audits relating to the operations of their respective departments and agencies. The LSC is a "designated Federal entity" to which the IGA applies, *see* 5 U.S.C. app. 3 § 8G(a)(2), and LSC OIG has the power to subpoena "all information, documents, reports, answers, records, accounts, papers and other data and documentary evidence necessary to the performance of the functions assigned by the Inspector General Act." *Id.* If its subpoenas are not complied with, the OIG may seek relief in a federal district court. *See id.* § 6(a)(4).

Beginning in 1998, a series of OIG audits of LSC grantees revealed inaccuracies in case reporting. Some grantees overstated the number of cases they handled, or included in statistical reports data from "cases" in which no legal services had been provided. In the summer of 1999, the General Accounting Office (GAO) conducted audits of case statistical data provided by five LSC grantees, including LSNY and LAB. GAO concluded that approximately 75,000 of the 221,000 cases reported to LSC by these five grantees were questionable. A House Judiciary subcommittee held hearings on September 29, 1999 on LSC statistical data. A subsequent conference report accompanying the appropriations bill for LSC's FY 2000 appropriations directed LSC OIG to "assess the case service information provided by the grantees, and ... report to the Committees no later than July 30, 2000, as to its accuracy, as described in the House report." H.Rep. No. 106–479, 145 Cong.Rec. H12230–02, 12308 (Nov. 17, 1999) (Conference Report on H.R.3194, Consolidated Appropriations Act, 2000).

**44**

On January 11, 2000, LSC OIG informed all LSC Executive Directors of its plan to carry out Congress's mandate. Under the plan, LSC OIG would require thirty grantees, selected at random, to submit data in two phases, or "data calls." The first data call required the production of the case number and legal problem codes (e.g, housing, employment) for each case reported by the grantee as closed during 1999. LSNY and LAB both complied with the first data call and provided the requested information to LSC OIG.

It is the second data call that presents the problem of this case. That data call requires the production of the case number *and the client name* for each case reported as closed during 1999. By letters dated March 14, 2000 and March 15, 2000, respectively, LSNY and LAB informed LSC OIG that they would not comply with this request. They asserted that disclosure of client names would invade the attorney-client privilege and violate ethics rules—that the client names could be linked with the problem codes that had already been produced, thus revealing, outside the attorney-client relationship, the motives behind client decisions to seek legal assistance.

LSC OIG disagreed that the attorney-client privilege applied, or that rules of professional responsibility could act as a bar to its access to client names. Nevertheless, it created a screening procedure designed to assure that nobody within LSC OIG could or would link a client name with its associated legal problem code.[1] With this system in place, LSC OIG

served subpoenas upon the custodians of records of the two respondents.

On March 29, LSNY objected. LSNY provided no client names, but undertook to provide "unique client identifiers." On March 30, LAB also objected. LAB provided full client names for cases in which it was confident that the information had already been disclosed to a third party, but it stated that, for all other cases, it would provide only the client's first name and a unique client identifier for the last name based on the client's first name, last name and date of birth.

LSC OIG filed the instant petition for enforcement on April 25, 2000.

*Analysis*

A. *Attorney–Client Privilege*

The organic LSC Act and the 1996 Omnibus Appropriations Act both contain provisions protecting attorney-client privileged information. *See* 42 U.S.C. § 2996h(d) ("neither the Corporation nor the Comptroller General shall have access to any reports or records subject to the attorney-client privilege"); § 509(h), Pub.L. No. 104–134, 110 Stat. 1321, 1321–59 (exempting from disclosure materials "subject to the attorney-client privilege"). Respondents submit that these protections apply to the OIG as well; that a person's *motivation* for seeking legal representation is protected by the attorney-client privilege; and that such motivation would be revealed by matching names with problem codes.[2]

The attorney-client privilege does *not* ordinarily protect the identity of

---

1. "The Inspector General has divided his staff into at least two teams to handle information being received, [with one data call] being received at the Inspector General's office by a team known as the Cases Team [which would be] entirely separate from the Names Team. [In addition,] separate electronic data and e-mail addresses have been established for funding recipients to send in their data to the Office of Inspector General. The material, whether in hard copy form or computer form, will be kept in separate locked rooms." *Unit-*

*ed States, et al. v. Legal Services of New York et al.,* Oral Arg.Tr., May 26, 2000, at 17–18.

2. Respondents submitted separate briefs in this case. There are significant differences in the manner in which each responded to LSC OIG's requests for information and the legal arguments each emphasizes—especially with respect to state ethical requirements. For purposes of this opinion, however, the dispositive legal issues for both respondents are essentially the same.

a client, the amount of a fee, or the general purpose of legal work performed. *See Clarke v. American Commerce Nat'l Bank,* 974 F.2d 127, 129 (9th Cir.1992). Some courts, beginning with *Baird v. Koerner,* 279 F.2d 623 (9th Cir.1960), have recognized an "extremely narrow" exception to this rule, when disclosure would implicate the client in criminal wrongdoing, or when disclosure, in conjunction with information already provided, would be tantamount to revealing an "indubitably confidential communication[ ]." *In re Witnesses Before the Special March 1980 Grand Jury,* 729 F.2d 489, 493 (7th Cir. 1984).

In the *Baird* case, an IRS summons to a lawyer sought disclosure of the identity of a client on whose behalf the lawyer had made an anonymous tax payment. The court found the privilege applicable, because to reveal the identity of a person who had sought legal assistance for such a purpose would also reveal that the person had effectively acknowledged his guilt of a tax offense. *See id.* at 633.

Respondents rely upon language found in several post-*Baird* decisions (none from this Circuit) which, they contend, expand the *Baird* exception to cases in which the disclosure of a client's name could conceivably reveal what motivated the client to seek legal assistance. The actual holdings of the cited cases, however, do not support so broad a proposition. *See Dole v. Milonas,* 889 F.2d 885, 889 (9th Cir.1989) ("generalized speculation" insufficient to trigger the exception where "[t]here is no contention ... that the government al-

ready is aware of some wrongdoing by appellant's clients and now seeks to learn those persons' identities"); *In re Grand Jury Witnesses, supra,* 729 F.2d at 492–93 (courts "apply the privilege only where disclosure of the client's identity or fees would in fact have revealed the substance of what were indubitably confidential communications"); *United States v. Jones,* 517 F.2d 666, 674–75 (5th Cir.1975) (exception applied only where it was "readily apparent" that the clients may be indicted because "the government admittedly intended to use those disclosures, if obtained, in furtherance of the grand jury's and its own investigations in whatever manner proved fruitful"); *see also In re Grand Jury Subpoenas,* 803 F.2d 493, 498 (9th Cir.1986) ("[t]he attorney-client privilege protects a client's identity only in limited circumstances where disclosure would convey the substance of a confidential professional communication between the attorney and the client").[3]

■ The *Baird* exception does not apply where disclosure of a client name would only reveal general information about the nature of the services performed. The fact patterns in *Baird* and its progeny involved clients facing possible criminal indictment or situations in which disclosing the subject matter of the legal services sought out by a named individual would be tantamount to disclosing "indubitably confidential communications." *In re Grand Jury Witnesses,* 729 F.2d at 493.[4] No specific case presenting such a problem appears of record here. The absence of specific facts leaves nothing but general-

**3.** For an in-depth examination of the tests courts have used to determine whether the *Baird* exception applies, see generally Steven Goode, *Identity, Fees and the Attorney–Client Privilege,* 59 GEO.WASH.L.REV. 307, 325–35 (1991). Professor Goode argues that courts apply one of three exceptions: (1) the "legal advice exception" (disclosure of the information would implicate the client in the very matter for which legal advice was sought, *see In re Sealed Case,* 877 F.2d 976, 979–80 (D.C.Cir.1989)); (2) the "last link" exception (disclosure would provide the "last link" to

criminal prosecution); and (3) the "communication" exception (disclosure would reveal information tantamount to a confidential professional communication). None of these exceptions squarely applies here.

**4.** Even information that "might" provide evidence of a client's wrongdoing does not automatically trigger the *Baird* exception. *See United States v. Horn,* 976 F.2d 1314, 1317 (9th Cir.1992) ("The terms 'confidential' and 'incriminating' are not synonymous.").

ized argument to support respondents' objections. Because "[b]lanket assertions of attorney-client privilege in response to a subpoena duces tecum are strongly disfavored," *In re Grand Jury Witness*, 695 F.2d at 362, the respondents' blanket assertion of privilege must be rejected.

This ruling does not mean that there is no case in which disclosure of the combination of a client's name and a problem code would reveal a client's "motive" for seeking representation, within the meaning of the cases. This ruling is not intended to foreclose specific claims of privilege as to individual clients.

B. *ABA and State Professional Responsibility Rules*

■ Respondents argue next that they are forbidden by applicable rules of ethics to turn over client names. LSNY asserts that Disciplinary Rule 4–101 of the New York Code of Professional Responsibility forbids them to disclose client names (and renders the subpoena unlawful) and argues that Rule 4–104's directive not to disclose client "secrets" protects a broader range of information than the attorney-client privilege.[5] LSNY also asserts that Rule 1.6 of the ABA Model Rules independently bars the requested disclosure.[6] LAB does not rely on Maryland professional responsibility rules, but resists disclosure under Model Rule 1.6.

The question presented by these arguments is whether the congressional mandate for audits of LSC grantees trumps the general provision of the LSC Act that LSC shall not "interfere with any attorney in carrying out his professional responsibilities to his client as established by the

[ethical guidelines] of the [ABA] ... or abrogate ... the authority of a State or other jurisdiction to enforce the standards of professional responsibility generally applicable to attorneys in such jurisdiction." 42 U.S.C. § 2996e(b)(3).

An apparently complete answer to that question is found in the plain language of section 509(h) of the 1996 Omnibus Appropriations Act, which provides: "*Notwithstanding* section 1006(b)(3) of the Legal Services Corporation Act [42 U.S.C. § 2996e(b)(3) ] ... financial records, time records, retainer agreements, client trust fund and eligibility records, and *client names* for each recipient *shall be made available* to any auditor or monitor of the recipient, including any ... agency that is auditing or monitoring the activities of the Corporation or of the recipient." P.L. 134–104, April 26, 1996, 110 Stat. 1321 (emphasis added).

Respondents submit, however, that a plain language application of section 509(h) is too facile. Because problem codes have already been turned over to LSC OIG, they argue, a client name is now *more* than a client name and indeed has mutated into a "secret" that an attorney cannot reveal without running afoul of her ethical obligations. Congress did mandate the disclosure of names (the argument goes), but it did not require the disclosure of secrets.

Let us assume for the sake of argument that, in New York at least, client names + problem codes = secrets. Respondents' argument must nevertheless be rejected. Respondents have presented no evidence, in the form of legislative history or other-

---

5. New York Disciplinary Rule 4–101 bars attorneys from revealing: (1) client confidences, defined as "information protected by the attorney-client privilege under applicable law;" and (2) client secrets, defined as "other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." *Id.*

6. ABA Model Rule 106 provides that, with certain exceptions, "[a] lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation." *Id.*

wise, that Congress intended its reference to "client names" to depend upon context.[7]

Indeed, I find the language of section 509(h) unambiguous, so that legislative history on either side could not change the statute's clear requirement that LSC grantees make available client names to any duly authorized auditor or monitor. That requirement not only expressly supersedes the broad undertaking of section 1006(b)(3) of the Legal Services Act, but—in New York and Maryland, and under ABA standards—it is the legal reason why a lawyer required to disclose client names under subpoena will not have run afoul of her ethical obligations. *See* DR 4–101(C)(2) (New York) (allowing a lawyer to reveal confidences and secrets when the disclosure is required by law or court order); MR 1.6(b)(4) (Maryland) (same); ABA Model Rule 1.6, cmt. 27 ("lawyer may be obligated or permitted by other provisions of law to give information about a client").

### C. *Reasonableness of the Subpoenas*

■ Respondents' next argument is that LSC OIG's insistence upon the disclosure of full client names is unreasonable, because their offer to provide independently verifiable identifiers would suffice to meet LSC OIG's needs without invading the attorney-client relationship.

They have a point. LSNY has submitted two declarations, unrefuted on this record, establishing that unique client identifiers could be generated by computer from preexisting databases, without any person seeking the actual client names, and listed alongside associated case numbers cheaply, quickly and accurately. LAB has represented, without refutation on the record, that a code for client names based on a Soundex algorithm "is actually a more ac-

curate identifier than a name is." Oral Arg.Tr. at 47. The use of unique client identifiers would appear to be less problematic, and even more cost-effective, than LSC OIG's "Chinese Wall."

■ However, "an administrative subpoena must be enforced if the information sought 'is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.'" *RTC v. Walde*, 18 F.3d 943, 946 (D.C.Cir.1994) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 94 L.Ed. 401 (1950)). Respondents do not argue, nor could they, that client names are not reasonably relevant to a congressionally-mandated assessment of LSC recipients' case statistics. Their argument, instead, is that there is a better way for LSC to collect the data it needs.

It is not the province of this court to decide the best way for LSC OIG to carry out its responsibilities. As Americans now have ample reason to know, there is no legal requirement that the power to investigate be tempered by wisdom or restraint. LSC's refusal to accept unique client identifiers in lieu of full client names may be clumsy and unnecessary, but I cannot say that it is unreasonable.

\*     \*     \*     \*     \*     \*

**ORDERED** that the petition for summary enforcement [# 1] is **granted.**

---

**7.** A noted scholar of the field, himself able to cite only a letter written by the OIG that is not in the public record, has observed that "[t]he LSC Inspector General sought this new requirement to ensure that LSC monitors, auditors, and the Comptroller General would

have access to this information, and that state ethical rules could not bar them from such access." Alan W. Houseman, *Restrictions by Funders and the Ethical Practice of Law*, 67 Fordham L.Rev 2187, 2227 & n. 249 (1999).