249 F.3d 1077 (D.C. Cir. 2001)
 United States of America and Leonard Koczur, Acting Inspector General of the Legal Services Corporation, Appellees
v.
Legal Services for New York City, Appellant
 No. 00-5244
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued April 10, 2001
Decided May 25, 2001
 
 [Copyrighted Material Omitted]
 Appeal from the United States District Court for the District of Columbia, (00ms0241)
 Carl W. Riehl argued the cause for appellant. With him on the briefs was John S. Kiernan.
 Michael S. Raab, Attorney, United States Department of Justice, argued the cause for appellees. With him on the brief were Wilma A. Lewis, United States Attorney at the time the brief was filed, and Mark B. Stern, Attorney.
 Laura K. Abel, David S. Udell, and Philip G. Gallagher were on the brief for amici curiae New York State Bar Association, et al., in support of appellant.
 Before: Ginsburg and Henderson, Circuit Judges, and Silberman, Senior Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge Silberman.
 Silberman, Senior Circuit Judge:
 
 
 1
 The Inspector General of the Legal Services Corporation petitioned for summary enforcement of a subpoena to appellant Legal Services of New York City. The district court granted the petition, and appellant now seeks review. We affirm.
 
 I.
 
 2
 Appellant provides legal services to the poor. Each year, it and other grantees receive multi-million-dollar federal grants administered through the non-profit Legal Services Corporation. In a series of audits beginning in 1998, the Corporation's Inspector General discovered improprieties in some grantees' reports to the Corporation--most commonly, overstatement of the number of cases handled and failure to keep adequate records. That led the General Accounting Office to audit five grantees, including appellant, and it concluded that of the 221,000 cases reported by these grantees, "approximately 75,000 ... were questionable." Expressing "concerns" about the inaccuracies in grantees' reports, a Congressional committee requested that the Inspector General "assess the case service information provided by the grantees" and "report ... no later than July 30, 2000, as to its accuracy."[1]
 
 
 3
 The Inspector General then required 30 grantees, including appellant, to produce for inspection two different sets of data on the cases they had reported closed during 1999. The first production, or "data call," required that for each case, identified only by case number, the grantee must select one of 52 "problem codes" to describe the subject matter of the representation. The problem codes vary from the specific--"Parental Rights Termination," "Black Lung"--to the general-"Education," "Contracts/Warranties"--and the catch-all-"Other Individual Rights," "Other Miscellaneous." Appellant complied with the first data call.
 
 
 4
 The second data call required that for each case, again identified only by case number, grantees identify their client. Appellant, along with one other grantee, refused to comply. It informed the Inspector General that, absent client consent, both attorney-client privilege and its attorneys' professional obligations prevented it from disclosing client names associated with case numbers, because to do so would allow the Inspector General to match client names with the problem codes previously produced. That linkage, appellant argued, would impermissibly reveal the subject matter of clients' representations. Though the Inspector General disagreed that production was barred, he nevertheless proposed to set up a so-called "Chinese wall"--separate staffs, equipment, storage, etc.--to prevent any linkage. The Inspector General then issued subpoenas for the data. Appellant refused to comply, and the Inspector General petitioned the district court for summary enforcement.
 
 
 5
 The district court granted the petition. It rejected appellant's blanket claim of attorney-client privilege as insufficient to demonstrate privilege regarding any given record. The court also turned aside appellant's claim based on professional obligations, holding that the subpoenas were within the Inspector General's statutory powers. Appellant had contended that the subpoenas were in addition unduly burdensome because the same verification could be performed without the damage this disclosure might cause to clients' perceptions of confidentiality, but the court deferred to the Inspector General as to requirements of the audit.[2] Appellant renews its arguments here.
 
 II.
 
 6
 The Inspector General contends, and the district court agreed, that appellant has not made out a valid claim of privilege. In rejecting appellant's unparticularized assertion of attorney-client privilege, the court stated that its ruling was "not intended to foreclose specific claims of privilege as to individual clients." 100 F. Supp. 2d at 46. In other words, as to some matters, appellant might be able to introduce contextual information demonstrating that the representation's subject matter is itself confidential. In its reply brief, appellant expressly reserves the right to present particularized privilege claims to the district court in the event that we reject its unparticularized claim. This possibility led us to question our jurisdiction. Appellant asserts that it lies under 28 U.S.C. 1291, which authorizes review of district courts' "final decisions," or in the alternative under 28 U.S.C. 1292(a)(1), which provides for interlocutory appeals from district court orders regarding injunctions.
 
 
 7
 We find no authority for treating an order enforcing a subpoena as an injunction appealable under 1292(a)(1). Courts have consistently held that grand jury and civil subpoenas are not injunctions appealable under that provision. See, e.g., United States v. Ryan, 402 U.S. 530, 534 (1971). Review is instead procured by refusing to comply and litigating the subpoena's validity in the contempt proceeding that ensues. See id. at 532; Office of Thrift Supervision v. Dobbs, 931 F.2d 956, 957 (D.C. Cir. 1991). Administrative subpoenas are horses of a slightly different color, since upon noncompliance the issuing agency seeks enforcement in the district court. See 5 U.S.C. app. 3 6(a)(4); Kemp v. Gay, 947 F.2d 1493, 1496 (D.C. Cir. 1991). The ensuing district court order, either granting or denying enforcement, is appealable under 1291 once final. See id. at 1497. In light of that there is even less reason to regard an administrative subpoena, either before or after enforcement, as an injunction.
 
 
 8
 Section 1291, which authorizes appeals of district courts' final decisions, presents a more viable jurisdictional ground. As noted, orders enforcing administrative subpoenas are appealable under 1291 once final. See FTC v. Invention Submission Corp., 965 F.2d 1086, 1089 (D.C. Cir. 1992). Here, however, the district court has indicated its willingness to entertain particularized claims of privilege. See 100 F. Supp. 2d at 46. So it can be asked why the order is final. The answer lies in the breadth of appellant's claim. It argues that the privilege properly understood allows it to refuse to provide any more justification for invoking the privilege than it has. It is not obliged to offer a particularized showing in individual situations. Since this argument is phrased so broadly, it follows that the district judge's rejection of it is final even though he offers the possibility of more limited relief in individual cases. That is so because under appellant's view of the scope of the privilege his order would encroach on the privilege.
 
 
 9
 The considerations we employ to evaluate finality are more practical than technical and do not require that the order appealed be the last order possible in the matter. See Gillespie v. United States Steel Corp., 379 U.S. 148, 152 (1964); In re Grand Jury Investigation, 604 F.2d 672, 674 (D.C. Cir. 1979) (per curiam).[3] In this case, the matters potentially remaining to be resolved below are substantively different than the claims disputed on appeal, would arise if at all only upon rejection of the appealed claims, and would require of appellant a potentially onerous effort. In other words, the potential inefficiencies of a piecemeal appeal do not outweigh the "danger of hardship and denial of justice through delay." Dickinson v. Petroleum Conversion Corp., 338 U.S. 507, 511 (1950). Insofar as appellant contends that the current record justifies an assertion of privilege without particularized showings, we have jurisdiction over that claim.
 
 
 10
 Unfortunately for appellant, although its claim is phrased broadly enough to provide us jurisdiction, its very breadth is untenable. Courts have consistently held that the general subject matters of clients' representations are not privileged. See, e.g., In re Grand Jury Subpoena, 204 F.3d 516, 520 (4th Cir. 2000). Nor does the general purpose of a client's representation necessarily divulge a confidential professional communication, and therefore that data is not generally privileged. To be sure, there are exceptions, but as always the burden of demonstrating the applicability of the privilege lies with those asserting it. See In re Lindsey, 158 F.3d 1263, 1270 (D.C. Cir. 1998) (per curiam); cf. In re Sealed Case, 877 F.2d 976, 979-80 (D.C. Cir. 1989). That burden requires a showing that the privilege applies to each communication for which it is asserted, see Lindsey, 158 F.3d at 1270-71, which, of course, appellant has not done.
 
 
 11
 * * * *
 
 
 12
 We turn to appellant's contention that the subpoena conflicts with its attorneys' professional obligations and is unduly burdensome, which the district court flatly rejected. Appellant explains that New York State and American Bar Association ethics rules protect both privileged information, discussed above, and unprivileged information deemed "secret." See Model Rules of Prof'l Conduct 1.6 cmt. 5 (1999); N.Y. Code of Prof'l Responsibility DR 4-101(A) (2000). Those rules preclude attorneys from revealing any information-privileged or not--relating to the representation of a client who has not consented to the disclosure, particularly where that information would be embarrassing or detrimental to the client. See Model Rule 1.6(a); DR 4-101(B)(1).[4]
 
 
 13
 The Legal Services Corporation Act of 1974 authorizes the Corporation to supervise grantees' compliance with applicable laws. See 42 U.S.C. 2996e(b)(1)(A). In doing so, however, the Corporation generally must respect the professional responsibilities incumbent on grantees' attorneys:
 
 
 14
 The Corporation shall not, under any provision of this subchapter, interfere with any attorney in carrying out his professional responsibilities to his client as estab lished in the Canons of Ethics and the Code of Profes sional Responsibility of the American Bar Association ... or abrogate as to attorneys in programs assisted under this subchapter the authority of a State or other jurisdiction to enforce the standards of professional re sponsibility generally applicable to attorneys in such jurisdiction. The Corporation shall ensure that activities under this subchapter are carried out in a manner consis tent with attorneys' professional responsibilities.
 
 
 15
 Id. 2996e(b)(3). The Inspector General, because he bears the burden of auditing and investigating grantees, is granted broad subpoena powers. See 5 U.S.C. app. 3 4(a)(1), 6(a)(4). He also enjoys a limited exception to 2996e(b)(3)'s restrictions:
 
 
 16
 Notwithstanding section [42 U.S.C. 2996e(b)(3)], fi nancial records, time records, retainer agreements, client trust fund and eligibility records, and client names, for each recipient shall be made available to any auditor or monitor of the recipient, including any Federal depart ment or agency that is auditing or monitoring the activi ties of the Corporation or of the recipient, ... except for reports or records subject to the attorney-client privilege.
 
 
 17
 Omnibus Appropriations Act of 1996, Pub. L. No. 104-134, 509(h), 110 Stat. 1321, 1321-59 (emphasis added).[5]
 
 
 18
 The Inspector General contends that 2996e(b)(3) is not even applicable because it restricts actions taken under the Legal Services Corporation Act, while his subpoena authority arises under the Inspector General Act. We think that argument is far-fetched. The Office of the Inspector General is an arm of the Corporation that "insure[s] the compliance of recipients and their employees" with applicable law. 42 U.S.C. 2996e(b)(1)(A); see 5 U.S.C. app. 3 8G(b). Although the Office was created after the Corporation, § 2996e delineated ethical obligations binding on the entire Corporation. See generally 42 U.S.C. 2996e.
 
 
 19
 Auditing the Legal Service Corporation's grantees poses ethical concerns not ordinarily presented to a government auditor. On the specific question of what materials an auditor of the Corporation's grantees may subpoena, 509(h) is our only guidance. Unlike the Inspector General Act, it focuses on the ethical obligations owed by those who audit the Corporation's grantees. Since 509(h) explicitly exempts auditors of the Corporation from 2996e(b)(3), which applies only to the Corporation, the necessary implication is that 2996e(b)(3) applies to auditors of the Corporation that are themselves part of the Corporation--that is, to the Inspector General. We therefore read §§ 509(h) and 2996e(b)(3) to impose obligations on the Inspector General with regard to both privileged and secret materials.
 
 
 20
 That is hardly the end of the matter. The restrictions in 2996e(b)(3) notwithstanding, 509(h) explicitly authorizes auditors of the Corporation to compel production of "time records, retainer agreements, ... and client names." The Corporation's own regulations require that retainer agreements "shall clearly identify ... the matter in which representation is sought [and] the nature of the legal services to be provided." 45 C.F.R. 1611.8(a). Disclosure of retainer agreements associated with client names would reveal exactly the sort of information appellant refuses to disclose: the general matter of individual clients' representations.[6]
 
 
 21
 Appellant suggests that the required disclosures nonetheless do not require disclosure of retainer agreements in a way that matches agreement to client. But appellant's construction of 509(h) is unnatural: if Congress had intended to require production of "time records, retainer agreements, ... and client names" only when disassociated from one another, surely it would have said so in terms different from the simple conjunctive phrasing in 509(h). We think this is the only sensible reading of 509(h) in the context of the Inspector General's audits of individual representations. Nevertheless, appellant claims that the Inspector General lacks authority to compel production of case numbers. Yet unique identifiers associating clients with their records are part and parcel of responsible legal practice. They are an integral constituent part of the very records to which 509(h) refers. See, e.g., 45 C.F.R. 1635.3(b)(2). The lack of an explicit statutory reference does not protect them from production. Since we conclude that grantees' ethical obligations do not prevent the Inspector General from compelling production of client names associated with problem codes, we need not reach the sufficiency of the Chinese wall instituted to prevent that association.
 
 
 22
 Appellant's last redoubt is the claim that the subpoena is unduly burdensome. We enforce subpoenas as long as they are "reasonably relevant" to the agency's purpose and "not unduly burdensome." Invention Submission Corp., 965 F.2d at 1089 (internal quotation marks omitted). Appellant eschews the usual complaint about administrative burden, see, e.g., Linde Thompson Langeworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp., 5 F.3d 1508, 1517 (D.C. Cir. 1993), and instead has a novel theory: it objects to the harm that disclosure of client secrets will do to its ability to assure clients of the secrecy of their communications. It argues that it could generate an identifier code that is unique to each client but does not reveal his or her identity, and that these identifiers would serve the Inspector General's purposes just as well as client names.
 
 
 23
 Frequently, concerns over burden are related to relevance: in determining whether a burden is due, courts often examine its tailoring to the purpose for which the information is requested--that is, its relevance. See FTC v. Texaco, 555 F.2d 862, 882 (D.C. Cir. 1977) (en banc); Dow Chem. Co. v. Allen, 672 F.2d 1262, 1269-70 (7th Cir. 1982). Still, appellant makes both arguments, and we treat burden and relevance separately because subpoenas might be relevant but still unduly burdensome. See In re FTC Line of Bus. Report Litig., 595 F.2d 685, 704 (D.C. Cir. 1978) (per curiam).
 
 
 24
 Actually, appellant wishes to undertake a greater administrative burden--production plus creation of unique client identifiers--in order to lessen the alleged professional detriment created by the subpoena. That "burden" would be undue if "compliance threatened to unduly disrupt or seriously hinder normal operations." FTC v. Texaco, 555 F.2d at 882. This subpoena does not. As discussed, it is wholly consistent with the rules governing client secrets and generally consistent with the attorney-client privilege, so it in no way alters the degree of secrecy appellant can justifiably promise its clients. The Chinese wall renders unlikely the possibility that any secrets will be disclosed. Even in that event, the information disclosed would be only the subject matter of the representation as stated in broad terms. We cannot say that the remote possibility of a linkage between client identity and problem code "unduly disrupts or seriously hinders" appellant's provision of legal services.
 
 
 25
 To justify its proposed modification, appellant asserts that actual client names are irrelevant to the Inspector General's purpose. The Inspector General of course disagrees, and we defer to his determinations of relevance unless they are obviously wrong. See Invention Submission Corp., 965 F.2d at 1089. The Inspector General asserts that "the most reliable way to detect errors and irregularities in grantee case reporting [is] to obtain the actual client names them-selves." He further contends that the proposed unique client identifiers would require expensive and time-consuming independent verification--which would, in any event, probably reveal the information appellant wishes to conceal. We certainly cannot say that the Inspector General is obviously wrong.
 
 
 26
 * * * *
 
 
 27
 The district court's order granting the petition for summary enforcement is affirmed, and the matter is remanded for possible further proceedings.
 
 
 28
 So ordered.
 
 
 
 Notes:
 
 
 [1]
 H.R. Conf. Rep. No. 106-479 (1999).
 
 
 [2]
 See United States v. Legal Services, 100 F. Supp. 2d 42 (D.D.C. 2000).
 
 
 [3]
 See also FTC v. Texaco, Inc., 555 F.2d 862, 873 n.21 (D.C. Cir. 1977) (en banc) (adopting the jurisdictional reasoning of the vacated panel decision, see FTC v. Texaco, Inc., 517 F.2d 137, 143 n.6 (D.C. Cir. 1975)). For example, where the district court has ordered a subpoena's subject either to comply or to produce a privilege log, we have nonetheless entertained an appeal of claims that would negate the need for such a decision. See Resolution Trust Corp. v. Thornton, 41 F.3d 1539, 1541-42 (D.C. Cir. 1994).
 
 
 [4]
 Both rules exempt disclosures required by court order. See Model Rule 1.6 cmt. 20; DR 4-101(C)(2). If the subpoena is within the Inspector General's power, then disclosure is consistent with appellant's ethical obligations.
 
 
 [5]
 Congress has incorporated 509(h) by reference into subsequent appropriations bills. See, e.g., Consolidated Appropriations Act of 2000, Pub. L. No. 106-113.
 
 
 [6]
 The Corporation's regulation on retainer agreements provides that a grantee "shall make the agreement available for review by the Corporation in a manner which protects the identity of the client." 45 C.F.R. 1611.8(a) (emphasis added). This is consistent with 2996e(b)(3)'s protection of client confidences and secrets and is therefore the general policy of the Corporation. But 509(h) is an explicit exception to 2996e(b)(3), so while the Corporation's mandate for the contents of retainer agreements informs our analysis, its general regulation regarding protection of client identity cannot trump a more specific--and contrary--statutory provision.